IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DEBORAH L. LESER,                                        )
                                                        )
                        Plaintiff,                      )
                                                        )
        *v.*                                             )
                                                        )
JONATHAN L. MAYES, Individually and in                  )
his Official Capacity; DAVID A. GIVEN,                  )        Cause No. 1:18-cv-467
Individually and in his Official Capacity; LEWIS        )
FEREBEE; Individually and in his                        )
Official Capacity; LE BOLER, Individually               )
and in her Official Capacity; LELA TINA                 )
HESTER; Individually and in her Official                )
Capacity; and SHALON DABNEY, Individually               )
and in her Official Capacity, WANDA                     )
LEGRAND, Individually and in her                        )
Official Capacity,                                      )
                                                        )
                        Defendants.                     )

**COMPLAINT FOR DAMAGES AND INJUNCTIVE
RELIEF AND REQUEST FOR TRIAL BY JURY**

        Plaintiff Deborah L. Leser, by counsel, for her Complaint for Damages and Injunctive

Relief and Request for Trial by Jury against Defendants Jonathan L. Mayes, Individually and in

his Official Capacity; David A. Given, Individually and in his Official Capacity; Lewis Ferebee,

Individually and in his Official Capacity; Le Boler, Individually and in her Official Capacity;

Lela Tina Hester, Individually and in her Official Capacity; Shalon Dabney, Individually and in

her Official Capacity; and Wanda Legrand, Individually and in her Official Capacity states as

follows:

**I.  NOTE**

        This matter is directly related to another matter that is pending in the United States

District Court for the Southern District of Indiana, Indianapolis Division – *Deborah L. Leser v.*

*Indianapolis Public Schools, et al.*, Cause No. 1:16-cv-2044-TWP-DML. To preserve Ms. Leser's rights to pursue these claims, Ms. Leser must file this *Complaint for Damages and Injunctive Relief and Request for Trial by Jury* before the statute of limitations runs as to these Defendants named in this *Complaint*. Ms. Leser has sought to amend her Complaint in the pending action, but no ruling has been made on Ms. Leser's *Motion for Leave to File Amended Complaint* [Dkt. 66], which seeks to amend the Complaint to add Jonathan L. Mayes; David A. Given; Lewis Ferebee; Le Boler; Lela Tina Hester; Shalon Dabney; and Wanda Legrand as Defendants in the pending matter. Thus, Ms. Leser brought this *Complaint for Damages and Injunctive Relief and Request for Trial by Jury* albeit it is a related matter.

## II.    INTRODUCTION

1.      This is an action brought by Deborah L. Leser. This action seeks damages and injunctive relief resulting from the Defendants' tortious conduct and violations of Ms. Leser's rights under the United States Constitution stemming from her wrongful termination from IPS. This action is against Mr. Mayes (in his individual and official capacities); Mr. Given (in his individual and official capacities); Dr. Ferebee (in his individual and official capacities); Ms. Boler (in her individual and official capacities); Ms. Hester (in her individual and official capacities); Ms. Dabney (in her individual and official capacities); and Dr. Legrand (in her individual and official capacities) (hereinafter referred to as "Defendants").

## III.    JURISDICTION

2.      Plaintiff Deborah L. Leser resided in Johnson County, Indiana at all times relevant to this action.

3.      Defendant Jonathan L. Mayes was the self-proclaimed and admitted Hearing Officer during Ms. Leser's hearing before the Board in June of 2016, and he resided in Marion County, Indiana at all times relevant to this action.

4.      Defendant David A. Given was the Lead Investigator, and he resided in Hamilton County, Indiana at all times relevant to this action.

5.      Dr. Lewis Ferebee is the Superintendent of Indianapolis Public Schools, and he resided in Marion County, Indiana at all times relevant to this action.

6.      Le Boler is the Chief Strategist at Indianapolis Public Schools, and she resided in Marion County, Indiana at all times relevant to this action.

7.      Lela Tina Hester was the Human Resources Director at Indianapolis Public Schools, and she resided in Marion County, Indiana at all times relevant to this action.

8.      Shalon Dabney was a Human Resources Case Manager at Indianapolis Public Schools, and she resided in Marion County, Indiana at all times relevant to this action.

9.      Wanda Legrand was the Deputy Superintendent at Indianapolis Public Schools, and she resided in Marion County, Indiana at all times relevant to this action.

10.     The Court has personal jurisdiction over all parties.

11.     The causes of action arose in Indianapolis, Indiana which is in Marion County, Indiana.

12.     Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over Ms. Leser's claims brought under 42 U.S.C. § 1983.

13.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Ms. Leser's Indiana state law claims.

### IV.     PLAINTIFF

14.     Deborah Leser is a resident and citizen of Johnson County, Indiana.

## V.      DEFENDANTS

15.     Defendant Jonathan L. Mayes was the self-proclaimed and admitted Hearing Officer during Ms. Leser's hearing before the Board in June of 2016, and he resided in Marion County, Indiana at all times relevant to this action.

16.     Defendant David A. Given was the Lead Investigator, and he resided in Hamilton County, Indiana at all times relevant to this action.

17.     Dr. Lewis Ferebee is the Superintendent of Indianapolis Public Schools, and he resided in Marion County, Indiana at all times relevant to this action.

18.     Le Boler is the Chief Strategist at Indianapolis Public Schools, and she resided in Marion County, Indiana at all times relevant to this action.

19.     Lela Tina Hester was the Human Resources Director at Indianapolis Public Schools, and she resided in Marion County, Indiana at all times relevant to this action.

20.     Shalon Dabney was a Human Resources Case Manager at Indianapolis Public Schools, and she resided in Marion County, Indiana at all times relevant to this action.

21.     Wanda Legrand was the Deputy Superintendent at Indianapolis Public Schools, and she resided in Marion County, Indiana at all times relevant to this action.

## VI.      STATEMENT OF FACTS

**Introduction**

22.     This lawsuit involves IPS violating Ms. Leser's State of Indiana Constitutional rights and U.S Constitutional rights to due process and IPS wrongfully terminating her employment at IPS based on this denial of due process.

23.     The violations by IPS the Board, Mr. Mayes, Mr. Given, Dr. Ferebee, Dr. Legrand, Ms. Boler, Ms. Hester and Ms. Dabney include, but are not limited to, the failure to

provide notice to Ms. Leser of the allegations against her and the failure of IPS and Mr. Given to advise Ms. Leser of her *Garrity* rights.

**Ms. Leser's Background**

24.     Ms. Leser began working for IPS in 1995 – more than twenty (20) years ago. Ms. Leser has no prior discipline.

25.     Ms. Leser has been a teacher, counselor, vice principal, small school leader, principal, coordinator of the partnership with IU P-16 center and a director at the district level during her time.  She spent one and a half (1 ½) years as a consultant for National Urban alliance starting in 2001, but worked with schools in IPS during that time.  She used her time and talent to do the very best for students and their families during her tenure.

26.     Ms. Leser is known for moving data in positive directions for the district.  During her time at George Washington, she was able to move a persistently failing school from an F to a C in just 2 years.  Her work there included raising test scores on ISTEP to be competitive with the districts high scoring magnets, increasing the graduation rate by thirty-percent (30%), and improving attendance and while decreasing discipline referrals and suspensions.

27.     After moving to the district offices as a director, she made notable contributions in increasing the overall district graduation rate while creating a district-wide waiver process that reduced district waivers to the lowest rates in Marion County.

As the District's Director of Student Services, she and her team reduced the districts suspension rates by more than 40% last year and decreased the districts expulsion rates by more than ninety-percent (90%).  These reductions led to federal recognition and a trip to the White House for Dr. Ferebee and team member, Cynthia Jackson. She has been interviewed in connection with elimination of the school-to-prison pipeline, implementation of the district's Naviance program, waiver reduction and literacy-based instruction

**Even Prior to Ms. Leser's Hearing, IPS Had Already Posted a Job Opening for Ms. Leser's Position as Director of Student Services**

28.     On June 21, 2016, six (6) days before Ms. Leser's hearing, IPS, the Board and Dr. Ferebee posted a job opening for Ms. Leser's position as Director of Student Services.

29.     Ms. Leser's right to be heard at her hearing on June 27, 2016 was violated as IPS, the Board and Dr. Ferebee had already clearly made the decision to terminate Ms. Leser's employment if IPS was already seeking another individual for Ms. Leser's position.

30. This is just one of the many ways that IPS, the Board and Dr. Ferebee violated Ms.
    Leser's due process rights.

**IPS's Failure to Provide Notice to Ms. Leser of the Basis for IPS's Termination of Her Employment**

31.     As required by Indiana Code § 20-28-7.5-2(a)(2), IPS failed to provide proper notice or at least sufficient notice to Ms. Leser.

32.     Specifically, IPS failed to sufficiently notify Ms. Leser of the reasons why it alleges that she violated IPS Policy 3213 and IPS Administrative Guideline 3213.01.

33.     IPS provided only an overly vague summary to support its contention that Ms. Leser violated the named Policy and Administrative Guideline.

34.     The Policy and Administrative Guideline contained five (5) pages of duties and directives, but IPS provides no facts whatsoever that were allegedly the basis for this violation(s) and also provides no part of these five (5) pages of duties and directives that were allegedly violated.

35.     Not only was there no duty or directive pointed out that was violated in these five (5) pages, but there was an absence of sufficient facts that brought about such a violation.

36.     During the Superintendent's Conference on June 9, 2016, counsel for IPS could not and would not state the factual basis for Ms. Leser's termination.

37.     Moreover, counsel for IPS stated during an additional prehearing conference on June 22, 2016 that the information provided in the June 1, 2016 termination letter is the sum total of the explanation of charges against Ms. Leser.

38.     The governing body of IPS were required to allow Ms. Leser to present evidence to refute the reason or reasons for contract cancellation, but because no reason or reasons for contract cancellation have been provided, Ms. Leser was not able to present evidence to refute the reason(s) as she is unaware of the reasons stated above to refute the reason(s). This lack of notice of the basis for IPS's termination also precluded Ms. Leser from her right to the heard because he did not know the wrong he had committed.

39.     Although the alleged notice seemingly gives a factual explanation, it actually did not.

40.     The legal claim of "insubordination" simply had no factual support whatsoever from a review of the letter.

41.     The other two claims only are supported by the generality of a "failure to follow" five (5) pages of single-spaced policy – none of which is specifically identified in any way; nor was it revealed what Ms. Leser did or did not do factually.

**The Board's Behavior During the Hearing was Unprofessional and Disrespectful**

42.     The Board's behavior during Ms. Leser's hearing was unprofessional and disrespectful. Not only did many of the Board Members roll their eyes and make comments during the hearing that were clearly derogatory toward Ms. Leser and her counsel, but some, including Board Member Kelly Bentley, did not pay much attention during the hearing, but instead played on their cellular phones.

43.     Indeed, at one point during Ms. Leser's hearing, Board Member Bentley threw papers at Ms. Leser's counsel, Kevin Betz.

44.     Moreover, Secretary LaNier Echols hysterically laughed during the hearing when Dr. Ferebee became defiant, refused to answer counsel for Ms. Leser's questions, refused to look at exhibits and merely glowered at Ms. Leser's counsel. Secretary Echols clearly condoned Dr. Ferebee's unprofessional and defiant behavior.

45.     Several Board Members also threatened to walk out – and, indeed, stood up to leave – when counsel for Ms. Leser wanted to ask one more question:

> **Mr. Betz:**    I have one last question.
> **Bentley:**     We're done. I'm leaving.

46.     Board Member Bentley and Secretary Echols also glowered at counsel for Ms. Leser when the hearing had concluded and they were walking out.

47.     Such disrespectful and unprofessional behavior during a hearing about a professional woman's twenty (20) year career was completely unfair to Ms. Leser and violated her due process right to be heard.

48.     Moreover, Mr. Mayes, the self-proclaimed and admitted Hearing Officer during Ms. Leser's hearing, advised the Board prior to and throughout the hearing process.

**<u>Ms. Leser's Statements to the Board</u>**

49.     During her hearing on June 27, 2016, Ms. Leser made the following statement to the Board:

> I know several of you and I'm telling you you know me as a rule follower as somebody that tries to follow policy and do the absolutely best for kids that I can. I've done it for 20 years in the district.  I've never done anything that wasn't what I believed I was supposed to do and where I didn't check with my superior and I checked about superior this time and I did what I believe was following policy. I haven't received any training that gave me anything different to do that what I understood from this policy. So I'm not sure how I was supposed to know that Dr. Ferebee wanted me to treat it differently. I believe in IPS and I believe in the kids and I think that my record with Washington, with the reduction of waivers, with the reduction of suspensions and expulsions with the good deal of the data that was used for Dr. Ferebee's raise came out of my department and my work when you have sked me to move data and do the right things for the kids. I have done it,

year after year after year. I don't know why anybody thinks all of a sudden I would decide to go rogue and not do the appropriate things for kids. It's not in me to do that. I appreciate your consideration of the matter.

50.     Moreover, when asked what Ms. Leser wanted to state during her interview with

David Given that she was not given a chance to say, Ms. Leser stated:

I don't know that there was any information I wanted to give Mr. Given. I felt like he was trying to force me into a corner and I didn't feel like he was someone who was trying to get at the truth. I felt like he was trying to get me to say what he wanted me to say. And you asked me before, I'm trying to think of how you worded it. What was I trying to do. I was trying to meet my obligation as an IPS employee who was told they had to go meet with the lawyer. That's what I was trying to do. I didn't know I was there to defend myself so there wasn't anything I was trying to get across or defend because I thought that we were just going there for an investigation to determine how we could improve policy and make things better. No one indicated to me that I was going there to fight for my job. I didn't find that out until much later. So I can't say there was anything I felt like I had to tell them. I just felt like everything that happened in that meeting was him trying to tell me what I was going to saying how I needed to say it. And I was actually when I found out that we had to did a second meeting with him, I was frankly terrified because he was so pushy and so putting words in my mouth it was frightening.

**Chronology of Fact Showing Due Process Violations**

51.     On February 5, 2016, IPS announced that a public hearing would be held on

February 16, 2016 as to a pay raise of $60,000 and a 2-year extension for Dr. Ferebee as well as

$30,000.00 in raises to subordinates to Dr. Ferebee. IPS also announced that there would be a

Board briefing on February 23, 2016 and would vote on this matter on February 25, 2016.

52.     On February 16, 2016, a Public Hearing was held where there was opposition to

Dr. Ferebee's pay raise and contract extension as well as opposition to the $30,000.00 in raises

for direct reports to Dr. Ferebee.

53.     One day later, on February 17, 2016, a parent reported the Shana Taylor matter to

Longfellow Academy. She initially reported it to Beryl Borel, who then reported it to Mr.

Jensen. Mr. Jensen, Ms. Borel, Michael Gibbs and Dr. Kevin Brown then met with the parent.

54.     On February 17, 2016, Mr. Jensen immediately contacted Ms. Leser who told Mr. Jensen to call Ms. Tina Hester per the policy/procedure. The policy stated:

> **What should you do if you can't figure out what to do?**
> Call the Title IX Coordinator at 226-3870 or the Assistant Superintendent, Human Resources at 226-4580, who are the primary resource persons in these matters.

55.     Ms. Hester received the photographs and inappropriate texts from the mother of the IPS student who was involved in the inappropriate relationship with Shana Taylor on February 17, 2016.

56.     Dr. Ferebee also learned of at least an inappropriate relationship between Shana Taylor and the student on February 17, 2016.

57.     Dr. Ferebee was told of these allegations by Le Boler after Ms. Leser informed both Ms. Boler and Dr. Legrand of the allegations on February 17, 2016.

58.     Ms. Hester decided on February 17, 2016 to not involve the police and assigned Shalon Dabney to investigate. Both were direct violations of law and policy.

59.     On February 22, 2016 at 5:45pm Ms. Dabney told Mark Cosand to report to Child Protective Services (CPS). Mr. Jensen had become ill on the evening of February 17, 2016 and asked Mr. Cosand to follow through with the situation.

60.     On February 23, 2016, Mr. Cosand reported the inappropriate relationship to CPS.

61.     On February 25, 2016, a vote was held on the pay raises and contract extension for Dr. Ferebee. The Board voted (minus 1 Board Member) to approve Dr. Ferebee's raise and extension as well as pay raises for direct subordinates of Dr. Ferebee's.

62.     On March 2, 2016, the Shana Taylor story broke publicly.

63.     Ms. Hester and Ms. Dabney were criminally charged with failure to make a Report on April 12, 2016.

64.     Ms. Hester and Ms. Dabney were permitted to resign from their employment on June 30, 2016.

65.     No criminal charges were ever filed against Ms. Leser.

**David Given Should Not Have Been Permitted to Testify Because of His Conflict of Interest**

66.     Under Rule 3.7 of the Indiana Rules of Professional Conduct, Mr. Given should not have been permitted to testify. Indeed, the Comments to Rule 3.7 of the Indiana Rules of Professional Conduct provides that "[t]he opposing party has proper objection where the combination of roles[1] may prejudice that party's rights [Ms. Leser's rights] in the litigation." In this situation, Mr. Given's dual roles as the investigator/witness and counsel for IPS and the IPS Board prejudiced Ms. Leser's rights; thus, Mr. Given should have been stricken as a witness in Ms. Leser's hearing. Ms. Leser's rights were extremely prejudiced by Mr. Given's dual roles and Ms. Leser objected to Mr. Given providing testimony as a witness and filed a motion to strike Mr. Given as a witness, but the Board denied Ms. Leser's Motion.

67.     Moreover, Mr. Given interviewed Ms. Leser on March 3, 2016. He introduced himself as an attorney representing IPS,[2] and stated that he wanted to gather facts about the

---

[1] The roles of witness and attorney for IPS.

[2] **Mr. Betz**:     And do you work for the board too, is that your client as well?
  **Mr. Given**:  Our client is the corporation. The corporation is run by the board and by its employees.
  **Mr. Betz**:     So did the board direct your investigation?
  **Mr. Given**:  No the board didn't direct—
  **Mr. Betz**     Did you consult with the board for the investigation?
  **Mr. Given**:  No.
  **Mr. Betz**:     Did you have any communications with the board about your investigations?
  **Mr. Given**:  Yes.
  **Mr. Betz**:     Oh you communicated with the board as well about your investigation
  **Mr. Given**:  (Nodded head up and down)

processing of the complaint that had been made against Ms. Taylor. This was a potential criminal issue, and there was an ongoing criminal issue relating to this matter at the time.

68.     During this investigatory interview with Mr. Given and during a second investigatory interview, Mr. Given failed to advise Ms. Leser of her *Garrity*[3] rights. Thus, any statements made to Mr. Given cannot be used.

69.     Mr. Given was hired by his client, IPS and the IPS Board, to conduct an "independent"[4] investigation.

70.     Mr. Given testified that he interviewed six (6) different individuals: Mr. Jensen, Mark Cosand, Ms. Leser, Ms. Dabney, Ms. Hester and James Sheroan. He did not interview all involved:

| | |
|---|---|
| **Mr. Betz**: | Did you know that Le Boler knew? |
| **Mr. Given**: | On what I learned during the course of the investigation. |
| **Mr. Betz**: | But you never investigated Le Boler, did you? |
| **Mr. Given**: | I never interviewed Mr. Boler no |
| **Mr. Betz**: | You never interviewed or investigated Ms. Legrand did you? |
| **Mr. Given**: | I did not interview her no |
| **Mr. Betz**: | And you didn't interview or investigate Mr. Ferebee, did you? |
| **Mr. Given**: | I talked with Mr. Ferebee, I didn't interview him or investigate him. |
| | |
| **Mr. Betz**: | Did you interview or investigate Beryl Borel? |
| **Mr. Given**: | I did not. |
| **Mr. Betz**: | Did you interview or investigate Michael Gibbs? |
| **Mr. Given**: | I did not. |
| **Mr. Betz**: | Did you interview or investigate Dr. Kevin Brown? |
| **Mr. Given**: | I did not. |
| **Mr. Betz**: | And why did—how did you make the decision of who not to investigate? |

---

| | |
|---|---|
| **Mr. Betz**: | So you are in an attorney client relationship with the board? |
| **Mr. Given**: | Certainly. |

[3] *Garrity v. New Jersey*, 385 U.S. 493 (1967).
[4] **Mr. Given**:  Well I think I was independent in the sense that I was outside of IPS
   **Mr. Betz**:     But you had fiduciary duties and you were in an attorney client relationship. You can't be independent when you are in an attorney client relationship, or unless you tell me you can.
   **Mr. Given**:  Well I guess it would all depend on what you mean by independent and in what context.

**Mr. Given**:   I didn't necessarily make a decision not to investigate

**Mr. Betz**:   Did you interview or investigate Sandy Bombic?

**Mr. Given**:   Did not. I mean other than what I learned through the course of people I talked with about any of those individuals, obviously.

71.    When Mr. Given testified on June 27, 2016 regarding Ms. Leser's interview, he admitted that Ms. Leser "didn't get all of the details of that, but Mr. Jensen generally described what it was and asked her for guidance on what to do about it."

72.    Moreover, Mr. Given testified on June 27, 2016 that even he did not know whether Ms. Leser had enough information to report: "So whether she knew enough at that point whether she had a reporting obligation is unclear."

73.    Mr. Given further testified: "Now Ms. Leser, when she told me about the details that she knew from Mr. Jensen, I think she didn't know the student's age at the time she talked with Mr. Jensen. She didn't ask what the age was. So whether she knew enough at that point whether she had a reporting obligation is unclear."

74.    Mr. Given also testified that the student's own mother works at CPS, but never reported the relationship between Shana Taylor and the student.

75.    Ms. Leser believed that Mr. Given employed bullying tactics during Ms. Leser's investigative interview in March of 2016. Indeed, Ms. Leser testified about the March of 2016 interview and stated: "What I mostly remember about the interview with Mr. Given was that he made many statement and he tried – I felt like he was forcing me to try and to say stuff, and he kept saying, 'is that right? Is that right?' And I walked out feeling like I didn't really say anything but he took everything he said as my agreement with that."

76.    Ms. Leser further testified: "I don't remember what I said. I just remember walking out of there being very frustrated and very angry that it was clear he was trying to put words in my mouth the whole time that wasn't what I did or what I said."

77.     Moreover, it appears that IPS misled Ms. Leser about the investigative interview: "I'll tell you the same thing that I have said each time is I don't recall. This interview was conducted in March. I've been off work for a couple of months. At the time I was even in there, I was told that it was interview to help IPS figure out how they should amend their policy. I didn't know it was a potential investigation of my actions."

**Ms. Leser Followed the Procedure and the Directives of IPS at All Times**

78.     After Mr. Jensen contacted Ms. Leser about a potentially inappropriate relationship, Ms. Leser, the Director of Student Services, directed Mr. Jensen to contact Ms. Hester pursuant to Procedure 3213.01.

79.     Procedure 3213.01 provides:

> **What should you do if you can't figure out what to do?**
> Call the Title IX Coordinator at 226-3870 or the Assistant Superintendent, Human Resources at 226-4580, who are the primary resource persons in these matters.

80.     Ms. Leser immediately called Human Resources and talked to Sandra Bombic after she was unable to reach Ms. Hester. Ms. Leser alerted Ms. Bombic to the situation at Longfellow that needed Ms. Hester's attention. Ms. Leser also left Mr. Jensen's contact information and asked that Ms. Hester contact him immediately to provide support. Ms. Bombic stated that she had located Ms. Hester and would pass the message along.

81.     Ms. Leser then called Dr. Wanda Legrand to inform her that there was a report of a sexual relationship between a student and staff member.  Ms. Leser informed Dr. Legrand that she had instructed Mr. Jensen to contact Ms. Hester for direction and had ensured that Mr. Jensen and Ms. Hester were in contact with each other.  Ms. Leser asked if she should contact Le Boler, Chief Strategist or if Dr. Legrand would. Dr. Legrand stated that Ms. Leser should call. Ms. Leser asked for Ms. Boler's contact information which was texted to her. Ms. Leser asked

Dr. Legrand if there was anything else she needed to do. Dr. Legrand indicated there was not, saying "sounds like you have it handled."

82.     Ms. Leser then attempted to call Ms. Boler. At that time, Ms. Boler did not answer, so Ms. Leser left a message on Ms. Boler's cell phone as well as her office phone. Thirty (30) minutes later, Ms. Leser spoke with Ms. Boler and answered her questions. Ms. Boler stated that she would inform Dr. Ferebee about the situation. Ms. Leser also asked Ms. Boler if there was anything else she needed to do.

83.     Ms. Leser called Mr. Jensen to see how he was doing. Ms. Leser told Mr. Jensen to keep records of everything he did and the instructions he received. Ms. Leser further told him he should follow the instructions given to him by Human Resources. Ms. Leser also stated that Ms. Taylor should have no contact with students. Mr. Jensen stated that he was told to send Ms. Taylor to Shalon Dabney in the morning. Ms. Leser stated that it was good that the Title IX coordinator was involved.

84.     Ms. Leser also learned that Ms. Hester directed Mr. Jensen to not provide any information to law enforcement officer. "Let's not involve the police just yet," she stated to Mr. Jensen when he informed her that he had an IPS law enforcement officer ready to assist with this situation.

85.     Dr. Ferebee admitted during the June 23, 2016 hearing that the police and CPS were one in the same for reporting child abuse.

86.     Ms. Hester's direction to Mr. Jensen is consistent with her direction to Le Boler and the IPS Police in her February 18, 2016 email. ("I asked that the school police stay out of it so that she is not charged and we can handle from HR perspective…."). In response, Le Boler informed Ms. Hester that she "saw Chief Garner sent an email to IPS Police reminding them of the confidentiality this morning").

87.     Ms. Hester's direction to keep the police out of it was also confirmed several news articles as well as the Probable Cause Affidavit for her criminal arrest.

88.     Dr. Ferebee also confirmed that he did not believe there was any mal-intent involved in the situation.

**Procedure 3213.01 is Outdated and Inapplicable.**

89.     Procedure 3213.01 provides in part: "**Fax the IPS Confirmation of Report to Child Protection Service form to the Student Services Department at 226-3665 as soon as possible, but not later than the end of the school day.**" (emphasis in original).

90.     The "Student Services Department" listed in Procedure 3213.01, however, is not the current Student Services Department as confirmed by Ms. Leser.

91.     In response to Vice-President Sam Odle's question regarding whether the Student Services in Procedure 3213.01 was different than the Student Services that Ms. Leser manages, Ms. Leser stated:

> That's correct. It was student services under special education when this policy was done. Student Services Department as it exists today did not exist at that time. It was simply under, I can't—Rob – Rob Warner, Rob Warner's provision under special education. There was not a separate – my job as it exists today was created by Dr. Ferebee and his staff. This policy was written far before that. Since Title IX was moved to HR it no longer existed under what it talks about and so my understanding was that with Title IX that where that went, it went to HR and it went to Shalon Dabney. It was no longer under and you can see it talks about the Title IX coordinator, the coordinator/school social work we all know that's Ginger Arvin that Title IX coordinator is no longer that person this policy is really out dated it needs to be reworked and it became very confusing.

92.     Ms. Leser is being unfairly and unlawfully terminated under a Procedure that does not even apply to her as Director of Student Services.

**Dr. Ferebee's Behavior was Unprofessional and Disrespectful Toward a 20-Year Employee of IPS**

93.     During Ms. Leser's hearing on June 27, 2016, Dr. Ferebee – the Superintendent of IPS – refused to answer questions or review exhibits.

94.     Dr. Ferebee was asked by counsel for Ms. Leser four (4) times if he ever considered anything less than dismissal for Ms. Leser. Each time he was asked by Mr. Betz, Dr. Ferebee responded that he did not understand the question.

95.     Dr. Ferebee, in response to counsel for Ms. Leser's questions, would either refuse to answer or would state "I'm not sure what question you are asking" to very simple questions such as when he learned about the relationship between Shana Taylor and the student.

96.     President Mary Ann Sullivan also had to direct Dr. Ferebee to answer questions: "Excuse me, Dr. Ferebee will you please answer the question. Would you please answer the question again in a clear way?"

97.     When asked to examine an exhibit, Dr. Ferebee refused to do so. The Board had to again force him to cooperate with Ms. Leser's counsel:

**Mr. Betz:**          Look at page 112. You're not going to do it, are you? You are going to sit there and be defiant, aren't you? Because you are mad you made a mistake and I'm trying to hold you accountable, aren't you?

(Long pause by Dr. Ferebee).

**Ms. Boshkoff**:     Objection
**Mr. Betz**:          Because you made a mistake and you want to be accountable for it, do you?

(Long pause by Dr. Ferebee).

**Ms. Boshkoff**:     Really not appropriate.
**Mr. Mayes**:        Kevin.
**Mr. Betz**:          No, I want the board to take notice of glaring and the defiant attitude of Mr. Ferebee because he is just as accountable—

(Long pause by Dr. Ferebee).

**President Sullivan**:   Just hold on. Dr. Ferebee, can you please look at the exhibit?

## Dr. Ferebee Learned of the Inappropriate Relationship on February 17, 2016, the Same Date it was Reported by the Mother of the Student, but Failed to Make Any Report

98.     Dr. Ferebee admitted during Mr. Jensen's hearing on June 23, 2016 that he was aware of the inappropriate relationship between Shana Taylor and the student on **February 17, 2016** – the same day that Mr. Jensen and Ms. Leser learned of the relationship.

99.     Specifically, Dr. Ferebee "learned that there was a report from a parent of a possible inappropriate relationship between a staff member and a student at Longfellow."

100.     Dr. Ferebee learned of this relationship through Ms. Boler.

101.     Ms. Leser had informed both Ms. Boler and Dr. Legrand of the possibly inappropriate relationship.

102.     Dr. Ferebee further admitted that he did not report the inappropriate relationship to CPS either although he had a duty to do so.

103.     Dr. Ferebee received a large pay raise and bonus of $60,000.00 and a 2-year contract extension for his nearly $210,000.00 a year job – on February 25, 2016 – mere days after learning of the inappropriate relationship and failing to report it.

104.     Dr. Ferebee began a cover-up of the Shana Taylor matter until his pay raise was approved by the IPS Board. Mr. Given testified that the investigation he performed was on behalf of IPS Administration and the IPS Board.

## Dr. Ferebee's Violations of Procedure 3213.01 and Policy 3213

105.     Dr. Ferebee himself violated Procedure 3213.01 and Policy 3213 in many ways.

106.     Although Dr. Ferebee was aware of the inappropriate relationship as early as February 17, 2016 – the same day as Ms. Leser – Dr. Ferebee failed to report anything to CPS or

the police. And Dr. Ferebee admitted on June 23, 2016 that he also had a duty to report as to this Shana Taylor matter.

107.    Dr. Ferebee also testified on June 23, 2016 that it was not his job as a chief executive and Superintendent to ask what kind of inappropriate relationship once he learned of an inappropriate relationship.

108.    Indeed, Dr. Ferebee testified on June 27, 2016 that it is not his job to gather specifics regarding a situation:

| | |
|---|---|
| **Mr. Betz**: | Mr. Ferebee you knew she was gathering evidence and interviewing Shana Taylor, and you knew it was an inappropriate sexual relationship as early as the 18th, right, or did you not know? |
| **Dr. Ferebee**: | I was told they were still gathering information |
| **Mr. Betz**: | She had interviewed Shana Taylor. What more information needed to be gathered? She had photographs of the obscene pictures that Shana Taylor sent to the victim and she had the inappropriate text and she talked to Shana Taylor. But you are saying Tina Hester withheld that information from you? |

(Another subject began but returned to this).

| | |
|---|---|
| **Dr. Ferebee**: | **Well, I don't gather specifics.** |
| **Mr. Betz:** | **You don't what?** |
| **Dr. Ferebee:** | **I don't gather specifics.** |

(emphasis added).

109.    Not only did he fail to report the inappropriate relationship between Shana Taylor and the student – which he admits he failed to do – but he also violated policy 3213.01 by interviewing the victim as well as the perpetrator – which is in direct violation of his policy. (This Policy states: "Do not discuss the matter with the alleged victim, the alleged perpetrator, staff members, or family members of the child.").

110.    Indeed, Dr. Ferebee testified on June 23, 2016 that Dr. Hester reported to him on February 17, 2016 that "[t]hat the matter was being investigated and the employee in question was being brought in for additional questions related to that matter."

111.    Based on this direct violation of Policy 3213.01, the perpetrator, Shana Taylor, attempted to visit the victim following her interview with IPS seemingly to request the victim to recant his story. ("Also, we got a call from [A.H.]'s mom that Ms [sic] Taylor showed up at their apartment this morning after her meeting with you.").

112.    Moreover, Dr. Ferebee testified that it was his "responsibility to establish those policies, procedures, and training, not to deliver those." In other words, it is not Dr. Ferebee's responsibility – according to Dr. Ferebee – to make sure the policies and procedures are followed, even a policy relating to sexual abuse of children.

**IPS's Wrongful Suspension and Termination of Ms. Leser**

113.    Following Ms. Leser's suspension on March 15, 2016, Ms. Leser was informed on June 1, 2016 that her contract was being terminated by IPS, and the recommendation to do so was made by Joyce Akridge.[5] This is a person that had no knowledge about Ms. Leser's actions or inactions in this matter because she was not involved in any way. Yet it was based on her recommendation that Lewis Ferebee decided to terminate Ms. Leser's contracts.

114.    Ms. Leser met with Dr. Ferebee on June 9, 2016 for a Superintendent Conference as part of her proposed termination. During this Superintendent Conference in which Dr. Ferebee allegedly investigate and interviewed Ms. Leser regarding potential criminal issues, Dr. Ferebee failed to advise Ms. Leser of her *Garrity*[6] rights. *See Devitt*, 499 F.2d at 141 (holding that "nor can disciplinary action be taken against the witness for his refusal to testify, unless he is first

---

[5] Ms. Leser never personally received this letter. At approximately 5:30 pm on May 31, 2016, an IPS police vehicle with an officer and an unidentified man arrived at Ms. Leser's house and asked her son where Ms. Leser was and when she would be home. Ms. Leser's son stated that she would not be home until after 7:00 pm and he did not know where she was.  Ms. Leser's son arrived home again at 8:00 pm and found the IPS police car parked in front of the house and was again confronted by the officer asking about his mother.  IPS returned to Ms. Leser's home at 11:00 pm, 11:30 pm on May 31, 2016 as well as 4:00 am, and 6:00 am on June 1, 2016.

advised that, consistent with the holding in *Garrity*, evidence obtained as a result of his testimony will not be used against him in subsequent criminal proceedings"). (citing *Gardner*, 392 U.S. 273). Thus, any statements made to Dr. Ferebee cannot be used.

115.    A hearing was held on June 27, 2016 in Ms. Leser's matter.

**Longfellow 12**

116.    IPS also failed to terminate all the members of the "Longfellow 12," except for Ms. Leser and Mr. Jensen. These are the individuals who knew about the inappropriate relationship, but failed to report it.

117.    The Longfellow 12 include the following individuals: (1) Lewis Ferebee; (2) Le Boler; (3) Wanda Legrand; (4) Tina Hester; (5) Shalon Dabney; (6) Deb Leser; (7) William Jensen; (8) Mark Cosand; (9) Beryl Borel; (10) Michael Gibbs; (11) Dr. Kevin Brown; and (12) Sandy Bombic.

## VII.    STATEMENT OF CLAIMS

### COUNT I
**(Failure to Provide Proper Notice to Ms. Leser as required by Indiana Code § 20-28-7.5-2(a)(2) in Violation of the 14th Amendment to the U.S. Constitution)**

118.    Ms. Leser incorporates the allegations of paragraphs 1 through 117 above and, in addition, states that the Defendants failed to provide proper notice or any sufficient notice to Ms. Leser as required by Indiana Code § 20-28-7.5-2(a)(2), in violation of the Fourteenth Amendments to the U.S. Constitution, actionable under 42 U.S.C. § 1983.

119.    Ms. Leser suffered the deprivation of her rights, liberties and immunities as secured and guaranteed under the Constitution and Laws of the United States of America and the State of Indiana.

---

[6] *Garrity v. New Jersey*, 385 U.S. 493 (1967).

120.    The failure to provide Ms. Leser with proper notice or any sufficient notice was in direct violation of Ms. Leser's constitutional rights and guarantees as secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Right to Due Course of Law under Article I, Section 12 of the Indiana Constitution. She was denied her right to be heard because she was not notified of the alleged wrong.

121.    The failure to provide Ms. Leser with proper notice or any sufficient notice was also so arbitrary and so capricious as to violate Ms. Leser's constitutional right to substantive due process as secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

122.    At all times relevant herein, the Defendants were acting under the color of state law.

123.    Ms. Leser has suffered and will continue to suffer damages because of the Defendants' unconstitutional actions.

**COUNT II**
**(Failure to Advise Ms. Leser of her Garrity Rights in Violation**
**of the 5th and 14th Amendments to the U.S. Constitution)**

124.    Ms. Leser incorporates the allegations of paragraphs 1 through 123 above and, in addition, states that she was not advised of her *Garrity* rights prior to being interviewed by IPS and Mr. Given, actionable under 42 U.S.C. § 1983.

125.    During this investigatory interview with Mr. Given and during a second investigatory interview, Mr. Given failed to advise Ms. Leser of her *Garrity* rights.

126.    Ms. Leser also met with Dr. Ferebee, the Superintendent of IPS. Dr. Ferebee failed to advise Ms. Leser of her *Garrity* rights during this interview as well.

127.    At the time of the interviews, Ms. Leser was facing potential criminal prosecution.

22

128.    IPS, Mr. Given and Dr. Ferebee failed to give Ms. Leser immunity from criminal prosecution on the basis of her answers.

129.    Moreover, IPS, Mr. Given (as investigator for IPS) and Dr. Ferebee as government employers, failed to warn Ms. Leser that because of her immunity, she could not refuse to answer the questions on the ground that the answers may incriminate her.

130.    Ms. Leser, under potential criminal prosecution at the time, was not advised of any rights, but was instead terminated from IPS.

131.    Ms. Leser has been damaged by this termination of her employment.

## COUNT III
### (IPS's Decision to Terminate Ms. Leser was Arbitrary and Capricious in Violation of the 14th Amendment to the U.S. Constitution)

132.    Ms. Leser incorporates the allegations of paragraphs 1 through 131 above and, in addition, states that the Defendants' decision to terminate her teaching and administrative contracts was arbitrary and capricious in violation of the Fourteenth Amendments to the U.S. Constitution, actionable under 42 U.S.C. § 1983.

133.    Ms. Leser suffered the deprivation of her rights, liberties and immunities as secured and guaranteed under the Constitution and Laws of the United States of America and the State of Indiana.

134.    The arbitrary and capricious decision to terminate Ms. Leser's teaching and administrative contracts was in direct violation of Ms. Leser's constitutional rights and guarantees as secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Right to Due Course of Law under Article I, Section 12 of the Indiana Constitution.

135.    The decision to terminate Ms. Leser's teaching and administrative contracts was so arbitrary and so capricious as to violate Ms. Leser's constitutional right to substantive due

process as secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

136.    The decision to terminate Ms. Leser was so arbitrary and capricious that IPS failed to and could not even state what Ms. Leser was supposed to do under the Policy or Procedure even as a minimally sufficient matter.

137.    At all times relevant herein, the Defendants were acting under the color of state law.

138.    Ms. Leser has suffered and will continue to suffer damages because of the Defendants' unconstitutional actions.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, Deborah Leser, prays for a judgment in her favor against Defendants, and that the following relief be awarded to the Plaintiff:

a.   A ruling reversing the Board's Findings and decision to terminate Ms. Leser's teaching and administrative contracts;

b.   An award of damages to compensate Ms. Leser for damages to her career and reputation by the unlawful practices described above;

c.   Compensatory damages and consequential damages;

d.   Punitive damages;

e.   Attorney's fees and costs;

f.   Prejudgment and postjudgment interest; and

g.   Grant such further relief as the Court deems necessary and proper in the public interest and pursuant to 42 U.S.C. § 1983.

## IX.    RESERVATION OF RIGHTS

Pursuant to the rules of pleading and practice, Ms. Leser reserves the right to assert additional violations of state and federal state law.

## X.      JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,


*s/ Jamie A. Maddox*_____
Kevin W. Betz, Esquire
Jamie A. Maddox, Esquire
*Attorneys for Plaintiff Deborah Leser*

BETZ + BLEVINS
One Indiana Square
Suite 1660
Indianapolis, Indiana 46204
Office: (317) 687-2222
Fax: (317) 687-2221
E-mail: litigation@betzadvocates.com